UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANTHONY BOBULINSKI and STEFAN
PASSANTINO,

Plaintiffs,

-v-

JESSICA TARLOV,

Defendant.

24-CV-2349 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiffs Anthony Bobulinski and Stefan Passantino ("Plaintiffs") bring this action

against Defendant Jessica Tarlov, asserting claims of defamation directly and by implication as

to both Plaintiffs and injurious falsehood as to Passantino.

Before the Court is Tarlov's motion to dismiss for failure to state a claim and motion for

attorney's fees under New York's anti-SLAPP law. For the reasons that follow, the motion to

dismiss is granted. And because the Court concludes that the mandatory fee-shifting provision

of New York's anti-SLAPP law applies in federal court, Tarlov's motion for attorney's fees is

also granted.

I.     **Background**

A.     **Factual Background**

The following facts are drawn from the allegations in Plaintiffs' complaint (*see* ECF No.

1 ("Compl.")), which are presumed true for the purpose of resolving Tarlov's motion to dismiss.

*Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013).

Anthony Bobulinski is a "successful businessman" and former "business partner" of

Hunter Biden. (Compl. ¶¶ 8, 11.) Stefan Passantino is an attorney and founder of Elections LLC

who represented Bobulinski in front of the United States House of Representatives Committee

1

on Oversight and Accountability ("House Oversight Committee").  (*Id.* ¶¶ 21, 22, 24.)  Jessica

Tarlov is a commentator on Fox News and co-host of its popular television program, *The Five*.

(*Id.* ¶¶ 25, 28.)

Bobulinski worked with Hunter Biden in 2017, when Bobulinski served as the CEO of

SinoHawk Holding, "a [Chinese] company designed to find investments in the United States."

(*Id.* ¶¶ 11, 19.)  During the course of this business partnership, Bobulinski became "concerned"

that Hunter Biden was allegedly misusing company funds and "profiting off of his father's name

when [his father] was Vice President of the United States."  (*Id.* ¶¶ 12-19.)

Bobulinski began "speaking publicly against the Biden family" in 2020.  (*Id.* ¶ 37.)

Since he "came forward" about the Bidens' alleged misconduct, Bobulinski has "spent over

$500,000 of his own money on legal fees."  (*Id.* ¶¶ 17, 37.)  And, according to Bobulinski,

"[n]either President Trump, nor any persons or entities affiliated with President Trump, have

ever paid" for Bobulinski's legal fees.  (*Id.* ¶ 37.)

On March 20, 2024, Mr. Bobulinski appeared as a witness before the House Oversight

Committee to testify about "the conduct he witnessed by Joseph Biden, Hunter Biden, and Biden

Family business associates."  (*Id.* ¶ 20.)  Passantino represented Bobulinski for the appearance

and attended the hearing with his client.  (*Id.*)  Bobulinski paid Passantino directly both for this

matter and "several years of previous representation."  (*Id.* ¶ 24.)

During the hearing, Representative Jasmine Crockett said on the floor of the House:

> Mr. Bobulinski, I know that you take exception to the fact that your credibility has
> been called into question over and over[.]  [D]o you know who Elections LLC
> is? . . . I'd ask unanimous consent to enter into the record a document indicating
> that the law firm representing Tony Bobulinski was paid $10,000 as recently as
> January of this year by the Save America PAC, which you may recognize as Donald
> Trump's PAC.

(*Id.* ¶ 58.)

Later that day, during Fox News's live taping of its nightly show, *The Five*, Tarlov commented on the House Oversight Committee hearing and said: "Ok, Tony Bobulinski's lawyers' fees have been paid by a Trump Super PAC. That's as recently as January." (*Id.* ¶ 29 ("March 20th Statement").)

In response to that statement, Plaintiffs sent Tarlov a letter "demand[ing] that Ms. Tarlov retract and apologize for her defamatory comments" about Bobulinski's legal fees. (*Id.* ¶ 31.) During the March 21st airing of *The Five*, Tarlov said:

> I would like to clarify a comment I made yesterday during our discussion of Tony Bobulinski's appearance at the congressional hearing. During an exchange with my colleagues about the hearing, I said that Mr. Bobulinski's lawyer's fees have been paid for by a Trump Super PAC as recently as January. What was actually said at the hearing was that the law firm representing Mr. Bobulinski was paid by a Trump PAC. I have seen no indication that those payments were made in connection to Mr. Bobulinski's legal fees, and he denies that they were. Alright.

(*Id.* ¶ 32 ("March 21st Statement").)

The following day, March 22, 2024, Plaintiffs sent Tarlov a second letter stating that her "attempted retraction was half-hearted, incomplete, and unacceptable," and demanding that she provide a more fulsome retraction, as dictated by Plaintiffs. (*Id.* ¶ 33.) However, Tarlov did not make any subsequent remarks on air about her previous statements. (*See id.*)

### B.    Procedural History

Plaintiffs commenced this action on March 28, 2024, asserting defamation and injurious falsehood. (Compl.) Tarlov moved to dismiss the action on May 20, 2024. (ECF No. 17.) Plaintiffs opposed the motion on July 1, 2024 (ECF No. 25 ("Opp.")), and Tarlov replied in support of her motion on July 29, 2024, also requesting oral argument before the Court (ECF No. 29).

On October 2, 2024, the Court ordered argument on the pending motion to dismiss (ECF No. 30), and on October 24, 2024, the parties conducted in-person oral argument.

## II.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint will be dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  In ruling on a motion to dismiss, the Court must accept the plaintiff's factual allegations as true, "drawing all reasonable inferences in favor of the plaintiff."  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

## III.    Discussion

Plaintiffs bring New York state law claims against Tarlov for defamation, defamation by implication, defamation *per se*, and injurious falsehood for the March 20th Statement and the March 21st Statement.  Tarlov moves to dismiss on the grounds that (1) Plaintiffs have failed to allege a defamatory statement; (2) Plaintiffs have not alleged facts that show actual malice; and (3) Plaintiffs' claims do not qualify as defamation *per se*, and Plaintiffs fail to plead special damages.  Tarlov also argues that she is entitled to attorney's fees under New York Civil Rights Law.  The Court agrees on all counts.

### A.    Defamation

To state a claim for defamation under New York law, a plaintiff must adequately allege: (1) a "defamatory statement," (2) "published to a third party," (3) "made with the applicable level of fault," (4) causing special damages or qualifying as defamation *per se*.  *Chandok v. Klessig*, 632 F.3d 803, 814 (2d Cir. 2011).  Tarlov does not contest that her statements were

published to a third party, but she does contend that Plaintiffs have failed to adequately establish the other three elements.

### 1.    Defamatory Statement

The New York Court of Appeals has defined "defamation" as "a false statement 'that tends to expose a person to public contempt, hatred, ridicule, aversion or disgrace.'" *Davis v. Boeheim*, 24 N.Y.3d 262, 269 (N.Y. 2014) (quoting *Thomas H. v Paul B.*, 18 N.Y.3d 580, 584 (N.Y. 2012)).  Whether or not Tarlov's on-air statements were defamatory is "a legal question to be resolved by the court[s] in the first instance." *Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (quoting *Aronson v. Wiersma*, 65 N.Y.2d 592, 593 (N.Y. 1985)).  In making this determination, a court must consider "the context of the entire statement . . . , tested against the understanding of the average reader, and if [the words are] not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction." *Aronson*, 65 N.Y.2d at 594.

### a.    Tarlov's March 20th Statement

On *The Five*'s March 20, 2024 airing, during a discussion about that day's House Oversight Committee hearing, Tarlov said:  "Ok, Tony Bobulinski's lawyers' fees have been paid by a Trump Super PAC.  That's as recent as January." (Compl. ¶ 29.)  Tarlov does not contest that this statement was false.  In fact, she concedes, the reason she made her subsequent comment was to "correct[] her statement on air." (ECF No. 19 ("Mem.") at 11.)  However, not every false statement is defamatory.  Here, the allegation that Bobulinski's attorney's fees were paid by a Trump PAC is not defamatory because it does not tend to expose either Bobulinski or Passantino to "public contempt, hatred, ridicule, aversion or disgrace." *Davis*, 24 N.Y.3d at 269.

### i.    Bobulinski

Bobulinski, a self-proclaimed "political moderate" (Compl. ¶ 16), made several decisions, relevant here, when faced with witnessing alleged misdeeds of the sitting Vice President of the United States.  First, Bobulinski came forward at a special press conference to tell his story and then immediately thereafter attended the final presidential debate as a personal guest of then-President Trump.[1]  (Mem. at 13.)  Second, he retained an attorney who was a former Trump White House attorney and founder of a law firm that had previously taken payment from the Save America PAC.  (Compl. ¶ 59.)  And third, Bobulinski agreed to appear before the House Oversight Committee's election-year impeachment inquiry hearing, entitled "Influence Peddling: Examining Joe Biden's Abuse of Public Office."[2]  (*Id.* ¶ 20.)  For a political commentator to then make a statement (incorrectly) about Bobulinski's connection to a "Trump Super PAC" does not impact Bobulinski's reputation meaningfully more than any of these other decisions.

Nor is it untoward for a congressional witness to have his legal fees paid for by a third party.  It is neither uncommon nor contrary to ethical rules for a third party to pay for someone's legal fees, so long as the client provides informed consent and the attorney's independence is not

---

[1] Plaintiffs do not challenge this fact included in Tarlov's memorandum in support of her motion to dismiss, nor do they assert that Tarlov should confine her argument to the facts set forth in the Complaint.

[2] *See Influence Peddling: Examining Joe Biden's Abuse of Public Office Before the H. Comm. on Oversight and Accountability*, 118th Cong. 5-6 (Mar. 20, 2024).  Because the substance of the March 20, 2024 House Oversight Committee hearing provides necessary context to understand Tarlov's remarks that afternoon and thus Plaintiffs' defamation claim, the Court takes judicial notice of the transcript from the hearing.  *See James v. Gannett Co.*, 40 N.Y.2d 415, 419 (N.Y. 1976).

compromised.[3]  Accusing Bobulinski of accepting third-party payment hardly subjects him to public disgrace given how expensive it is to retain an attorney as qualified and experienced as Passantino.  (*See* Compl. ¶¶ 21-23 ("Mr. Passantino has had an unblemished and highly distinguished career as a lawyer with extensive experience handling sensitive ethical, political, and legal issues for high-profile clients.").)

Bobulinski contends that Tarlov's statement "subjected him to hatred, distrust, ridicule, contempt, and/or disgrace by a certain segment of America and the world which lives in an alternate reality."  (Compl. ¶ 50.)  But case law directs courts to look to a "reasonable" interpretation by the "average" listener, and the Court is not prepared to assume that the average American "lives in an alternate reality."[4]  *See Aronson*, 65 N.Y.2d at 594.  Further, the Second Circuit has held that allegedly defamatory statements are to be construed as they would "by the public to which they are addressed."  *Celle*, 209 F.3d at 177-78 (quoting *November v. Time Inc.*, 13 N.Y.2d 175, 178 (N.Y. 1963)).  Bobulinski has not alleged that an average viewer of *The Five* would be more likely than the average American to hear this comment connecting him to President Trump and hate, distrust, or ridicule him.  Nor could he.  However, regardless of whether the scope of this inquiry is the average intended listener or the average American more generally, Bobulinski fails to make the case that Tarlov's statement subjected him to public ridicule or contempt.  Connecting Bobulinski to the former—and future—democratically elected

---

[3] *See* Model Rules of Professional Conduct r. 1.8 cmt. 14 (Am. Bar Ass'n 1983) ("Lawyers are frequently asked to represent a client under circumstances in which a third person will compensate the lawyer, in whole or in part."); D.C. Rules of Professional Conduct r. 1.8(e), cmt. 10 (same); N.Y. Rules of Professional Conduct r. 1.8(f), cmt. 11 (same).

[4] It is not clear what, exactly, Plaintiffs mean by "liv[ing] in an alternate reality."  If this moniker is shorthand for those who cannot discern fact from fiction, defamation law cannot coherently be built on the views of the average person who cannot tell truth from falsity.

President of the United States simply cannot be grounds for an average American's hatred, distrust, or ridicule.

Nor has Bobulinski adequately alleged defamation by implication. Bobulinski argues that the March 20th Statement "negatively impl[ied] that his testimony is bought and paid for." (Compl. ¶ 50.) "Under a defamation-by-implication theory, [Plaintiff] 'must make a rigorous showing that' [the statement] 'as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference." *Lindell v. Mail Media Inc.*, 575 F. Supp. 3d 479, 488 (S.D.N.Y. 2021) (quoting *Stepanov v. Dow Jones & Co.*, 987 N.Y.S.2d 37, 37-38 (1st Dep't 2014)); *see also Kavanagh v. Zwilling*, 578 F. App'x 24, 24-25 (2d Cir. 2014) (summary order) (quoting the same).

At the outset, the Complaint does not even specify what defamatory implication Plaintiffs believe Tarlov intended her viewers to draw, alleging only that her statement "caused . . . viewers[] not to trust or find credibility with Plaintiffs." (Compl. ¶ 62.) Stating that a congressional witness's legal fees are paid by a PAC may imply nothing more than that the witness shares or sympathizes with the beliefs of that PAC. Tarlov might have said such a thing to emphasize the fact that Bobulinski was invited by House Republicans as a majority witness.[5] Or she might have been pointing out that there are two sides to every story, and presenting only Bobulinski's side during the on-air discussion was not painting the full picture. But it is a "strained or artificial construction" to interpret Tarlov's statement as accusing Bobulinski of lying to Congress. *Aronson*, 65 N.Y.2d at 594.

---

[5] *See Influence Peddling*, 118th Cong. 5-6 (statements of Rep. James Comer, Chairman and Rep. Jamie Raskin) (identifying Bobulinski as a witness for the Republican majority).

Further, even if one could reasonably interpret Tarlov's statement to suggest that Bobulinski perjured himself, Bobulinski has not met his burden of adequately alleging that Tarlov "intended or endorsed that inference." *See Lindell*, 575 F. Supp. 3d at 488. Plaintiffs state that Tarlov "intended and endorsed" the inference "in order to serve her personal political agenda, and the agenda of those with whom she associates politically." (Compl. ¶ 63.) But beyond this conclusory statement, the only reason Plaintiffs provide is that Tarlov had previously "exhibited her malice for Plaintiffs," as evidenced by her February 21, 2024 comments on *The Five*: "Even Senate Republicans have not found Tony Bobulinski to be credible, so, he gives a great cable news interview. I understand it's very compelling for people who want to believe Joe Biden is actually Gotti, a mob boss." (Compl. ¶¶ 43, 63.) Tarlov's job is to be a political commentator on current events, so this kind of on-air comment does not reasonably indicate personal animus, but rather reflects Tarlov's observations on a high-profile political event. Bobulinski also points to the fact that on March 20, 2024, Tarlov reposted a *Daily Beast* article with the headline "Trump's PAC Burned $230,000 a Day on Legal Bills in February." (*Id.* ¶ 40.) But again, Bobulinski is asking the Court to take too many inferential jumps to view this social media post about the Save America PAC as evidence that Tarlov intended for her audience to interpret her comments about Bobulinski's receipt of PAC money as an accusation of perjury.

Because the March 20th Statement was not directly or impliedly defamatory with respect to Bobulinski, Bobulinski fails to meet his burden on this element.

### ii.        Passantino

The March 20th Statement also does not subject Passantino to "public contempt, hatred, ridicule, aversion or disgrace." *See Davis*, 24 N.Y.3d at 269. Passantino is "one of the leading political lawyers in the country" (Compl. ¶ 21) and previously served as Deputy White House

Counsel for former President Trump (*Id.* ¶ 22).  Thus, his name and professional reputation have been associated with Trump and affiliated political entities previously.  Further, Passantino admits that it is "a true fact that the [Save America] PAC has paid Stefan Passantino's firm, Elections LLC, in the past . . . ."  (*Id.* ¶ 59.)  Tarlov stating that Passantino once again accepted third-party payment from the same PAC from which he previously accepted third-party payment cannot reasonably be interpreted by the average listener (of *The Five* or more generally) as defamatory.

Defamation by implication fails here as well.  Passantino argues that Tarlov's March 20th Statement "indicat[ed], in conspiracy-theory fashion, that Mr. Passantino was part of a scheme to present politically motivated and improperly paid-for tainted testimony in violation of his ethical duties."  (*Id.* ¶ 51.)  Yet this implication requires even more logical jumps than the one offered by Bobulinski.  Here, the listener must interpret Tarlov's comment as insinuating that because a third party paid Bobulinski's legal fees, Bobulinski's (unnamed) lawyer ignored the governing ethical rules of his profession[6] and coached Bobulinski to lie in front of Congress.

And even if this interpretation were reasonable, Passantino has failed to adequately allege that Tarlov "intended or endorsed" such an inference.  *See Lindell*, 575 F. Supp. 3d at 488. Passantino does not allege any facts about Tarlov's underlying intent, and he does not allege that Tarlov even knew who Passantino was at the time she made the statement about Bobulinski.

Passantino thus fails to allege a defamatory statement with respect to Passantino.

### b.    Tarlov's March 21st Statement

On *The Five*'s March 21, 2024 airing, Tarlov "clarif[ied]" her statement from the previous day, stating:

---

[6] *See supra* n. 3.

> I would like to clarify a comment I made yesterday during our discussion of Tony Bobulinski's appearance at the congressional hearing.  During an exchange with my colleagues about the hearing, I said that Mr. Bobulinski's lawyer's fees have been paid for by a Trump Super PAC as recently as January.  What was actually said at the hearing was that the law firm representing Mr. Bobulinski was paid by a Trump PAC.  I have seen no indication that those payments were made in connection to Mr. Bobulinski's legal fees, and he denies that they were.  Alright.

(Compl. ¶ 32.)

This statement is not defamatory on its face because it is not false.  "[O]n a pre-answer motion to dismiss a defendant will prevail on this ground only if the statement's truth may be established from the complaint alone."  *Stega v. New York Downtown Hosp.*, 31 N.Y.3d 661, 674 (N.Y. 2018).  In their Complaint, Plaintiffs excerpt Representative Jasmine Crockett's comments to Bobulinski during the hearing:  "[T]he law firm representing Tony Bobulinski was paid $10,000 as recently as January of this year by the Save America PAC, which you may recognize as Donald Trump's PAC."  (Compl. ¶ 58.)  Tarlov's clarification merely restated exactly what Representative Crockett said in the Committee hearing the day before, none of which Plaintiffs have alleged is untrue.

Plaintiffs do not actually argue that Tarlov's second statement was false, but rather contend that by not saying more and not explicitly retracting her previous statement, this "omission of . . . context" "did nothing to dispel the negative impression left with the viewers that [the March 20th Statement] may, in fact, be true."  (*Id.* ¶ 60.)  "New York courts have . . . been hesitant to find defamation based on the omission of facts, unless the omitted facts would materially change the meaning of the statements that are expressed."  *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 466 (S.D.N.Y. 2012).

It stretches the English language too far to hear Tarlov's clarification as a wink and a nod and that she was really telling the truth the day before.  While it is true that Tarlov could have used the word "retraction" rather than "clarification," such a decision is well within the "editorial

judgment" of a media commentator. *See Cohn v. Nat'l Broad. Co.*, 67 A.D.2d 140, 145 (1st Dep't 1979), *aff'd*, 50 N.Y.2d 885 (N.Y. 1980). Tarlov was not required to regurgitate the word-for-word script demanded by Plaintiffs' counsel in order for her second statement to count as a retraction. And even if such an inference were reasonable, defamation by implication fails because Plaintiffs do not allege any facts suggesting that Tarlov intended such an inference. *See Lindell*, 575 F. Supp. 3d at 488.

Further, using the exact language Plaintiffs demanded—"Mr. Bobulinski has paid over $500,000[] in legal fees . . . out of his own pocket since 2020"—would not materially change the meaning of what Tarlov said on March 21st. (ECF No. 1-1 at 2.) Tarlov said that she had "seen no indication" that the Save America PAC's payments to Passantino's firm "were made in connection to Mr. Bobulinski's fees," and she clarified that "[Bobulinski] denies that they were." (Compl. ¶ 32.) Tarlov's rephrasing of the demand letter sent by Plaintiffs' counsel does not substantively change its import. Though Tarlov qualified her own words to say that Bobulinski denied his fees were paid by the Save America PAC rather than to state the assertion as a fact, such a qualification is exactly the kind of editorial prudence that generally protects media commentators from overstating or misleading viewers when they do not have the full facts in front of them. It would be ironic indeed if the Court were to determine that a commentator, in an attempt to be more careful with assertions on air, instead triggered a defamation case for what she might have been insinuating with her qualified language.

Because the March 21st Statement was not false and does not qualify as defamation by omission or implication, it is not defamatory as to Bobulinski or Passantino.

### 2.    Fault

#### a.    Standard of Fault

The next element of defamation that Tarlov challenges is that a statement must be "made

with the applicable level of fault." *Chandok*, 623 F.3d at 814 (2d Cir. 2011).  Here, "actual

malice" is the correct standard to apply to both Bobulinski and Passantino's claims, because

Tarlov's comments were about "an issue of public interest," to which New York "anti-strategic

litigation against public participation" (anti-SLAPP) law applies the actual malice standard.

N.Y. Civ. Rights Law § 76-a(2); *see Kesner v. Dow Jones & Co., Inc.*, No. 22-CV-875, 2023

WL 4072929, at *2 (2d Cir. June 20, 2023).[7]  The New York legislature has directed courts to

construe an issue of public interest "broadly," meaning "any subject other than a purely private

matter."  N.Y. Civ. Rights Law § 76-a(1)(d).  Given that Tarlov's statements were about a

congressional witness during an impeachment investigation into a sitting president, there is little

question that she was speaking about a matter of public interest.

The actual malice standard of fault also applies to Bobulinski because he is a "limited-

purpose public figure."[8]  *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015).  The Second

---

[7] Plaintiffs assert that "New York's anti-SLAPP statutes do not apply in federal court." (Opp. at 30).  Because Section 76-a(2) is a substantive provision that does not conflict with a federal procedural rule, and "[c]ourts have uniformly found the anti-SLAPP amendment . . . to apply to diversity actions," the Court applies it here.  *Kesner v. Buhl*, 590 F. Supp. 3d 680, 693 (S.D.N.Y. 2022) (collecting cases), *aff'd sub nom. Kesner v. Dow Jones & Co., Inc.*, No. 22-CV-875, 2023 WL 4072929 (2d Cir. June 20, 2023); *see also La Liberte v. Reid*, 966 F.3d 79, 86 n.3 (2d Cir. 2020) (clarifying that an anti-SLAPP statute that "rais[es] the *substantive* standard that applies to a defamation claim" would apply in federal court); *Isaly v. Garde*, 213 N.Y.S.3d 852, 859 (N.Y. Sup. Ct. 2024) ("That New York has chosen to protect more speech under its state constitution and statutory law than might be required by the federal constitution is within New York's sovereign discretion.").

[8] Tarlov argues that Passantino also qualifies as a limited-purpose public figure because he is frequently in the news and "is already well known for involvement in related public and political controversies."  (Mem. at 19.)  However, because the actual malice standard will apply regardless under New York state law, and it is a harder question as to whether a lawyer

Circuit looks to four factors to determine whether a plaintiff qualifies as a limited-purpose public figure:  The Plaintiff must have "(1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media." *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 136-37 (2d Cir. 1984).

When Bobulinski publicly "came forward" and accused the President of the United States of foreign corruption (Compl. ¶ 17), he "invited public attention" and "voluntarily injected himself" into a high-profile public controversy.  And when he voluntarily participated in the congressional impeachment inquiry, he "assumed a position of prominence."[9]  He also appeared with then-President Trump at a press conference in 2020 and attended the final presidential debate as a guest of Trump.[10]  Finally, given the extensive media coverage of Bobulinski over the past four years and his role in the recent impeachment inquiry, he has sufficient access to the media, including Fox News, to use as a platform for any necessary rebuttal, something ordinary citizens lack.[11]  *See Gertz v. Welch*, 418 U.S. 323, 344 (1974) ("The first remedy of any victim

---

representing a limited-purpose public figure qualifies as a limited-purpose public figure himself, *see Gertz v. Welch*, 418 U.S. 323, 345-46 (1974), the Court need not reach that argument.

[9] *See* Eric Cortellessa, *House GOP Plans For Next Impeachment Inquiry Witness: Hunter Biden's Former Business Partner*, TIME (Sept. 29, 2023), https://time.com/6319064/hunter-biden-impeachment-witness-tony-bobulinski/ (describing House Republicans working with "Bobulinski's lawyers" to have him appear as a witness).

"[T]he court may take judicial notice of the existence of articles written by and about [a plaintiff], though not for the truth of the matter asserted in the documents themselves. Courts in this Circuit have employed judicial notice in making determinations about whether plaintiffs are public figures at the motion to dismiss stage."  *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 271 n.9 (S.D.N.Y. 2013), *aff'd*, 622 F. App'x 67 (2d Cir. 2015) (summary order).

[10] Cortellessa, *supra* note 9.

[11] *See, e.g.*, Catherine Herridge, *et al.*, *Hunter Biden's former business partner was willing to go before a grand jury. He never got the chance.*, CBS News (June 29, 2023),

of defamation is self-help—using available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation. . . . [P]ublic figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy.").

### b.    Applying Actual Malice

To show actual malice, plaintiffs must adequately allege that the statement at issue was "made with knowledge of its falsity or with reckless disregard of whether it was false." N.Y. Civ. Rights Law § 76-a(2); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). The actual malice standard is intentionally a high bar. "[T]o insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).

Plaintiffs do not adequately allege that Tarlov knew her statement about Bobulinski's legal funding was false. Other than making conclusory assertions that Tarlov made the statements either "knowing that they were false or with reckless disregard for the truth" (Compl. ¶¶ 49, 53), Plaintiffs provide no additional supporting facts to indicate Tarlov's subjective state of mind. *See BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 822-24 (S.D.N.Y. 2021) ("[The Complaint] fails to plausibly establish any basis of subjective knowledge" because "[it] alleges no nonconclusory facts that support the proposition that [the defendant] knew that it was reporting falsities."), *aff'd*, No. 21-CV-1097, 2022 WL 598973 (2d Cir. Mar. 1, 2022). Plaintiffs

---

https://www.cbsnews.com/news/hunter-biden-tony-bobulinski-former-business-partner-grand-jury/; Brian Flood, *Tony Bobulinski tells Tucker Carlson Joe Biden was 'chairman' of Hunter Biden's overseas business dealings*, Fox News (Oct. 4, 2022), https://www.foxnews.com/media/tony-bobulinski-tucker-carlson-joe-biden-chairman-hunter-biden-overseas-business-dealings; *'Plausible deniability': Tony Bobulinski claims Biden family shrugged off concerns about risk to 2020 bid*, Fox News (Oct. 27, 2020), https://www.foxnews.com/politics/plausible-deniability-tony-bobulinski-biden-family.

state: "Given that Defendant is a political operative and has a wealth of resources by virtue of working for a mass media company, Defendant was aware, more than most, that a Trump Super PAC was not paying Mr. Bobulinski's legal fees." (Compl. ¶ 39.) However, even assuming such granular data was readily available, Plaintiffs do not allege that Tarlov actually used those resources to look up the Save America PAC's fund disbursements. Further, had Tarlov looked up the PAC's public disclosures, she would have seen that it had previously paid Elections LLC (*see* Compl. ¶ 59), and might have mistakenly, but reasonably, believed that those funds were used to pay for Bobulinski's fees. Thus, Plaintiffs fail to state a claim that Tarlov acted with knowledge of the alleged falseness.

Nor do Plaintiffs adequately allege that Tarlov acted with "reckless disregard." In order to allege reckless disregard, Plaintiffs must "establish that defendant[] in fact entertained serious doubts as to the truth of the publication or that [she] actually had a high degree of awareness of its probable falsity." *Sweeney v. Prisoners' Legal Servs. of N.Y., Inc.*, 84 N.Y.2d 786, 793 (N.Y. 1995) (cleaned up); *see also Kipper v. NYP Holdings Co.*, 12 N.Y.3d 348, 354-55 (N.Y. 2009) ("The inquiry is a subjective one, focusing upon the state of mind of the publisher of the allegedly libelous statements at the time of publication."). Plaintiffs have failed to allege any such facts about Tarlov's subjective state of mind.

Though Plaintiffs state that "[p]ayments from PACs are also available in public filings, none of which show a Trump-affiliated PAC paying for Mr. Bobulinski's legal fees" (Compl. ¶ 41), just because such information is publicly available does not mean that Tarlov was under an affirmative duty to seek it out before she spoke on air. As the New York Court of Appeals has stated, a failure to investigate, absent the "extreme case" of "willful avoidance of knowledge," *Kipper*, 12 N.Y.3d at 355, is insufficient to prove actual malice "even if a prudent person would

have investigated before publishing the statement." *Sweeney*, 84 N.Y.2d at 793.  Plaintiffs have

not alleged facts supporting an inference that Tarlov was willfully blind to the truth.

Because Plaintiffs have failed to meet the high bar of adequately alleging that Tarlov had

knowledge of falsity or reckless disregard for the truth, they have not pleaded actual malice.

### 3. Damages

The third and final defamation element Tarlov challenges is harm.  Defamation,

ordinarily, "is not actionable unless the plaintiff suffers special damage" which is defined as "the

loss of something having economic or pecuniary value." *Liberman v. Gelstein*, 80 N.Y.2d 429,

434 (N.Y. 1992) (quotation marks omitted); *Palin v. N.Y. Times Co.*, 113 F.4th 245, 268 (2d Cir.

2024).  Special damages require a specific accounting beyond a rough estimate. *Drug Rsch.*

*Corp. v. Curtis Pub. Co.*, 7 N.Y.2d 435, 441 (N.Y. 1960) (holding that "round figures, with no

attempt at itemization" do not qualify as special damages); *see also Thai v. Cayre Grp., Ltd.*, 726

F. Supp. 2d 323, 330 (S.D.N.Y. 2010) ("The particularity requirement is strictly applied, as

courts will dismiss defamation claims for failure to allege special damages with the requisite

degree of specificity.").

Plaintiffs have requested "compensatory, special, and punitive damages of thirty million

dollars ($30,000,000.00)" and "[a]n award of Plaintiffs' costs associated with this action,

including but not limited to their reasonable attorneys' fees and expenses."  (Compl. at 17.)  The

only details Plaintiffs provide are identical statements that each of the three separate claims

(defamation, defamation by implication, and injurious falsehood) entitles Plaintiffs to

$10,000,000.  (Compl. ¶¶ 54, 64, 69.)  This rough estimation, devoid of accounting or

explanation, is insufficient to allege special damages.

Plaintiffs argue that they do not need to allege special damages because their claims

qualify as defamation *per se*.  The four types of statements that traditionally fall under

defamation *per se*, as recognized by the New York Court of Appeals, are statements "(i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman." *Liberman*, 80 N.Y.2d at 434. The Complaint does not specify which of these categories supposedly applies to Tarlov's statements, but the only two that could plausibly apply are the first and second. However, the Court has already determined that Tarlov's comments cannot be reasonably interpreted as accusing Bobulinski of having committed perjury, even under a defamation-by-implication theory. *See supra* Section III.A.1.a.i.

Bobulinski also fails to adequately allege that Tarlov's statements tended to injure him in his capacity as a businessman. The New York Court of Appeals has held that, for a statement to qualify as defamation *per se* under the professional conduct exception, the statement must specifically reference conduct that is incompatible with a person's profession, "rather than a more general reflection upon the plaintiff's character or qualities." *Liberman*, 80 N.Y.2d at 436 (quotation marks omitted). The Court cannot discern how comments about a political entity paying Bobulinski's legal fees in front of a congressional hearing are related to his profession or professional capacities.

The same is true of Passantino's claim of defamation *per se*. Passantino alleges that Tarlov's statements "deliberately injured Mr. Passantino in his trade, business, or profession by indicating, in conspiracy-theory fashion, that Mr. Passantino was part of a scheme to present politically motivated and improperly paid-for tainted testimony in violation of his ethical duties." (Compl. ¶ 50.) But as previously discussed, the allegation that Passantino was accepting third-party payment from a PAC would not be a violation of his ethical duties. *See supra* Section III.A.1.a.ii.; n.3. So long as Passantino follows the specific professional conduct guidelines of

his jurisdiction, he is free to do so.[12]  And again, it is an unwarranted logical jump for a listener to hear Tarlov's statements and infer that Passantino was coaching his clients to lie on the witness stand.  *See supra* Section III.A.1.a.ii.

Because Plaintiffs have failed to allege either special damages or defamation *per se*, they fail to adequately allege the specific harm necessary to proceed with a defamation claim.

### B.    Injurious Falsehood

Tarlov contends that Passantino fails to state a claim for injurious falsehood for the same reasons his defamation *per se* claim was insufficiently pleaded:  Passantino fails to plead actual malice and special damages, and Tarlov's statements did not implicate his professional services.[13]  Injurious falsehood, also known as "trade libel," "consists of the knowing publication of false matter derogatory to the plaintiff's business of a kind calculated to prevent others from dealing with the business or otherwise interfering with its relations with others, to its detriment." *Kasada, Inc. v. Access Cap., Inc.*, No. 01-CV-8893, 2004 WL 2903776, at *15 (S.D.N.Y. Dec. 14, 2004) (citing and collecting New York state court cases).  In addition to a statement "denigrating the quality of the plaintiff's business's goods or services," a plaintiff must allege "1) falsity of the alleged statements; (2) publication to a third person; (3) malice; and (4) special damages." *Grayson v. Ressler & Ressler*, 271 F. Supp. 3d 501, 518 (S.D.N.Y. 2017) (quotation marks omitted).

---

[12] *See D.C. Rules of Professional Conduct* r. 1.8(e) (stating rules for attorney's who accept third-party payment); *N.Y. Rules of Professional Conduct* r. 1.8(f) (same).

[13] Tarlov also argues that the Court should dismiss Passantino's claim as "duplicative" of his defamation claim (Mem. at 32), but Courts may permit plaintiffs to proceed with alternative, though overlapping, claims at the motion to dismiss stage.  *See Trump Int'l Hotel & Tower v. Carrier Corp.*, 524 F. Supp. 2d 302, 314 (S.D.N.Y. 2007) ("New York law entitles a plaintiff to assert alternative theories of liability[,] [and a plaintiff] is not required to elect one theory of recovery over the other.").

In addition to failing to plead special damages, *see supra* Section III.A.3, Passantino fails to adequately allege the threshold requirement of an injurious falsehood claim because he has not connected Tarlov's statements to the quality of his services as an attorney.[14]  Passantino states that Tarlov implied "that Mr. Passantino is simply facilitating false testimony to Congress and/or is serving a particular political agenda."  (Compl. ¶ 67.)  But, as explained previously, such multi-step inferences pointing toward Passantino coaching his clients to perjure themselves stretch Tarlov's words too far to be a reasonable interpretation.  *See supra* Section III.A.1.a.ii. And the allegation that Passantino may be "serving a particular political agenda" does not denigrate the quality of his services as an attorney who self-identifies as "one of the leading political lawyers in the country," founded a law firm named "Elections LLC," and previously served as an attorney in the White House.  (Compl. ¶¶ 21-22.)

Passantino's claim of injurious falsehood is therefore dismissed.

### C.     Attorney's Fees

Tarlov asks the Court, should she succeed on her motion to dismiss, to award attorney's fees under the amended New York anti-SLAPP law.  (Mem. at 34-35.)  Plaintiffs oppose Tarlov's request, arguing that the attorney's fees provision "do[es] not apply in federal courts" because it conflicts with Federal Rule of Civil Procedure 12(b)(6).  (Opp. at 30.)  Plaintiffs argue in the alternative that the attorney's fee provision cannot apply because Tarlov did not bring "a separate action" or counterclaim for fees.  (*Id.* at 32.)

---

[14] Tarlov also urges the Court to require an actual malice standard for injurious falsehood because "[a]s a speech-based tort, injurious falsehood is subject to limits placed on libel actions by the First Amendment."  (Mem. at 32 (quotation marks omitted).)  However, because Passantino fails other necessary elements of injurious falsehood, the Court declines to reach the question of the standard of fault, which has not been directly addressed by the New York Court of Appeals or the Second Circuit.

### 1.    Applicability of Section 70-a(1) in Federal Court

In 2020, New York amended its anti-SLAPP law "to broaden the scope of the law and provide greater protections to defendants." *Kesner*, 590 F. Supp. 3d at 699 (quotation marks omitted). That amendment included Section 70-a(1), which states, in relevant part:

> A defendant in an action involving public petition and participation, as defined in paragraph (a) of subdivision one of section seventy-six-a of this article, may maintain an action, claim, cross claim or counterclaim to recover damages, including costs and attorney's fees, from any person who commenced or continued such action; provided that:
>
> (a) costs and attorney's fees shall be recovered upon a demonstration, including an adjudication pursuant to subdivision (g) of rule thirty-two hundred eleven or subdivision (h) of rule thirty-two hundred twelve of the civil practice law and rules, that the action involving public petition and participation was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law.

N.Y. Civ. Rights Law § 70-a(1).

Whether a state statutory provision applies to a case in a federal court sitting in diversity is an *Erie* question, which requires federal courts to "apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 427 (1996) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)). The Supreme Court's latest guidance on the hazy division between "substantive" or "procedural" law is found in *Shady Grove Orthopedic Associates v. Allstate Insurance Co.*, 559 U.S. 393 (2010), a "diversity jurisdiction case with a plurality opinion which has generated differing interpretations by courts and scholars." *Corley v. United States*, 11 F.4th 79, 88 (2d Cir. 2021).

### a.    *Shady Grove*, *La Liberte*, and *Adelson*

The portion of the *Shady Grove* opinion commanding a majority of justices instructs courts, before they conduct a full *Erie* analysis, to first to determine whether a Federal Rule of Civil Procedure "attempts to answer the same question" as a state statute. *Shady Grove*, 559

U.S. at 399. Plaintiffs answer this threshold question by asserting that Section 70-a(1) conflicts directly with Rule 12(b)(6) because the language of Section 70-a(1)—that attorney's fees are available when a case has been "commenced or continued without a substantial basis in fact and law"—creates a "heightened pleading standard," inapplicable in federal court. (Opp. at 30.) For support, they cite cases from this Circuit that have held Section 70-a(1) inapplicable in federal court, based on the Second Circuit's decision in *La Liberte v. Reid*, 966 F.3d 79 (2d Cir. 2020). (*See* Opp. at 30 n.1.)

But Plaintiffs fail to grapple with an important difference between *La Liberte* and this case. *La Liberte* addressed a California statute which provided for a "special motion to strike" described by California courts as "an efficient *procedural mechanism* for the early and inexpensive *dismissal of nonmeritorious claims*" that threatened a person's First Amendment rights "in connection with a public issue." *La Liberte*, 966 F.3d at 85 (internal quotation marks omitted) (emphasis added). The Second Circuit thus held that this procedural mechanism for dismissal "is already answered (differently) by Federal Rules 12 and 56," thus failing *Shady Grove* step one. *Id.* at 87. Due to its square conflict with the Federal Rules governing dismissal of a plaintiff's claims, the California special motion to strike could not apply in federal court. *Id.*

Here, however, the operative rule is not procedural. The only procedural rule that the Court is applying is a federal rule: Rule 12(b)(6). And the only element of New York's anti-SLAPP law that the Court is applying is *substantive*: the rule that a defendant is entitled to fees in a defamation action that is "without substantial basis in fact and law." The Second Circuit has consistently held that provisions for attorney's fees are a substantive, not procedural, right. *See, e.g.*, *Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 53 (2d Cir. 1992) ("State law creates the substantive right to attorney's fees . . . .") (collecting cases); *see also Alyeska Pipeline Serv.*

*Co. v. Wilderness Soc'y*, 421 U.S. 240, 259 n.31 (1975) (in diversity cases, "state law denying the right to attorney's fees or a giving a right thereto, which reflects a substantial policy of the state, should be followed").

Indeed, in *Adelson v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014), the Second Circuit found it "unproblematic" to conclude that the mandatory fee-shifting provision in Nevada's anti-SLAPP law was "substantive within the meaning of *Erie*" and "does not squarely conflict with a valid federal rule."  Applying the fee-shifting provision on a Rule 12(b)(6) motion in that case, this Court explained:

> The legal impact of the Nevada Anti-SLAPP statute—at least as applied in this case—is substantive rather than procedural for purposes of *Erie*.  The Nevada statute does not establish a "reasonable probability of success" standard that must be met without discovery, like the California Anti-SLAPP law. . . . [E]ven if the *procedural* elements of certain Anti-SLAPP statutes present problems under *Erie*, . . . those problems are not presented in this case, where the effects of the Anti-SLAPP law (fee-shifting and a heightened substantive legal standard) are substantive.

*Adelson v. Harris*, 973 F. Supp. 2d 467, 494 n.21 (S.D.N.Y. 2013), *aff'd*, 774 F.3d 803 (2d Cir. 2014).

The court in *La Liberte* did not purport to overrule its earlier decision in *Adelson*. Instead, it distinguished *Adelson*, quoting this Court's language above and noting that Nevada's anti-SLAPP law was "quite different" from California's due to the latter's "reasonable probability of success" standard.  *La Liberte*, 966 F.3d at 86-87 n.3.  The *La Liberte* court went on to consider the defendant's and *amici*'s argument that the fee-shifting provision of the California law should apply upon the granting of a Rule 12(b)(6) motion, irrespective of the procedural nature of the rest of the anti-SLAPP law.  The court rejected that argument on the basis of a specific feature of the California law:  Because "California's anti-SLAPP statute likewise awards attorneys' fees *only* to 'a prevailing defendant *on a special motion to strike*,'" *id.*

at 88-89 (quoting Cal. Civ. Proc. Code § 425.16(c)(1) (emphasis in original), the court concluded, state law had not authorized fee-shifting on a Rule 12(b)(6) dismissal.  The court further noted that "[t]he California Legislature presumably could have awarded attorneys' fees to the prevailing party in any defamation action, but it chose not to do so."  *Id.* at 89 n.6.

This Court concludes that *Adelson*, and not *La Liberte*, controls this case under the New York anti-SLAPP law's fee-shifting provision, for three reasons.  First, the New York anti-SLAPP law does not include a "reasonable probability of success" requirement like the California law addressed in *La Liberte*.  Rather, it operates more like the Nevada anti-SLAPP law at issue in *Adelson*.[15]

Second, the New York anti-SLAPP law does not have the feature of California's law that the *La Liberte* court considered fatal to its application in federal court: a provision tying fee-shifting to a specific state procedural mechanism.  As the First Circuit recently concluded (and as explained further below), "section 70-a [of the New York Civil Rights Law] does not condition an award of attorneys' fees solely upon prevailing under the procedural provisions of New York's anti-SLAPP statute, as opposed to under federal law." *Cheng v. Neumann*, 106 F.4th 19, 24 n.2 (1st Cir. 2024); *see also infra* n.23.

Third, the entitlement to attorney's fees under the New York anti-SLAPP law follows from the failure to state a claim as a matter of New York law.  Logically, a complaint that fails to

---

[15] The New York anti-SLAPP law provides that attorney's fees "shall be recovered upon a demonstration . . . that the [SLAPP] action . . . was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law."  N.Y. Civ. Rights Law § 70-a(1).  One might initially read the "substantial basis in fact and law" language as somewhat similar to California's "probability of success" language.  However, as explained below, the New York appellate courts have made clear that, as a matter of New York law, the failure to state a claim itself constitutes a demonstration that the action lacks a "substantial basis in fact and law"— triggering mandatory fee-shifting.

state a claim is, *a fortiori*, "without a *substantial* basis in fact and law and could not be supported by a *substantial* argument for the extension, modification or reversal of existing law." N.Y. Civ. Rights Law § 70-a(1) (emphasis added). But more importantly, the New York State appellate courts, interpreting the anti-SLAPP law, have held—repeatedly—that that substantive standard for fees is automatically met by a SLAPP suit's failure to state a claim.[16] In other words, whatever *else* the phrase "without a substantial basis in fact and law" means, it is certainly triggered by the failure to state a claim. In *Reeves v. Associated Newspapers, Ltd.*, 218 N.Y.S.3d 19 (1st Dep't 2024), the Appellate Division, First Department, provided a detailed analysis of the text, history, and structure of the anti-SLAPP law, holding that "a complaint which fails to state a claim under CPLR 3211(a)(7) necessarily lacks a 'substantial basis in law' for purposes of CPLR 3211(g)" and "entitles defendants to attorneys' fees pursuant to Civil Rights Law § 70-a[1]." *Id.* at 30-31; *accord 215 W. 84th St Owner LLC v. Bailey*, 217 A.D.3d 488, 488-89 (1st Dep't 2023) ("[T]he action was 'without a substantial basis in fact and law,' as demonstrated by the court's dismissal of the complaint for failure to state a claim."); *Goldman v. Abraham Heschel Sch.*, 227 A.D.3d 544, 545 (1st Dep't 2024) ("Plaintiff's failure to meet the CPLR 3211(a)(1) and (7) standard necessarily establishes his failure to meet the higher CPLR 3211(g) standard."); *Aristocrat Plastic Surgery P.C. v. Silva*, 206 A.D.3d 26, (1st Dep't 2022) ("Civil Rights Law § 70-a was amended to mandate, rather than merely permit, the recovery of costs and attorneys' fees upon demonstration 'that the [SLAPP] action . . . was commenced or continued without a

---

[16] Though the New York Court of Appeals has not addressed this issue directly, decisions of the intermediate appellate courts are "helpful indicators of how the state's highest court would rule," and courts look to their decisions unless "convinced by other persuasive data that the highest court of the state would decide otherwise." *DiBella v. Hopkins*, 403 F.3d 102, 112 (2d Cir. 2005) (citation omitted). Given the unanimity of the Appellate Division rulings on this issue, and the extensive and persuasive analysis of the court in *Reeves*, the Court has little hesitation in predicting that the New York Court of Appeals would rule in the same way.

substantial basis in fact and law . . . .'"; remanding for reinstatement of attorney's fee demand upon dismissal for failure to state a claim).  That these decisions involved trial courts' dismissals under CPLR 3211(a)(7)—New York's version of Rule 12(b)(6)—does not change the analysis. Nothing in the courts' decisions suggests that they were purporting to apply a procedural requirement as opposed to the substantive "substantial basis" standard for SLAPP claims to trigger fee-shifting.[17]

In short, the anti-SLAPP law here—a motion for attorney's fees upon a Rule 12(b)(6) dismissal—is doing no procedural work; it is merely defining the substantive standard for entitlement to attorney's fees.  To return to the *Shady Grove* analysis: the Federal Rule—Rule 12(b)(6)—does not "answer[] the question in dispute," 559 U.S. at 398: namely, whether the

---

[17] The New York CPLR 3211(a)(7) motion to dismiss for "fail[ure] to state a cause of action" is parallel to the federal standard of Rule 12(b)(6).  *Compare Tax Equity Now N.Y. LLC v. City of New York*, 42 N.Y.3d 1, 12 (2024) ("On a CPLR 3211(a)(7) motion to dismiss for failure to state a cause of action, the Court affords the pleading a liberal construction.  We accept the facts as alleged in the complaint as true, accord plaintiff the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory.  The only question is whether the complaint adequately alleges facts giving rise to a cause of action, not whether it properly labeled or artfully stated one." (cleaned up)), *with Twombly*, 550 U.S. at 570 ("[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."), and *Koch*, 699 F.3d at 145 ("For the purpose of reviewing the grant of a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, we accept as true the facts alleged in the Complaint, drawing all reasonable inferences in favor of the plaintiff.").

Theoretically there might be some daylight between the CPLR 3211(a)(7) standard and the Rule 12(b)(6) standard as a result of *Twombly* and *Iqbal*, which do not apply in New York state court.  But that difference is not salient here, because Plaintiffs' claims clearly fail for multiple reasons under New York law even absent any "plausibility" requirement of Rule 12(b)(6).  To be clear, a federal court dismissing a New York SLAPP claim that would survive dismissal *but for* the plausibility requirement of *Twombly* and *Iqbal* would not be strictly bound by the New York state court decisions cited here, but would have to separately analyze the "substantial basis in fact and law" standard for attorney's fees and predict how the New York Court of Appeals would rule in the case.

defendant is entitled to attorney's fees based on a demonstration that the claim is "without a substantial basis in fact and law."[18]

Passing this threshold question, the *Shady Grove* majority would next direct courts to "wade into *Erie*'s murky waters." *Shady Grove*, 559 U.S. at 398. Entitlement to attorney's fees is a substantive right under *Erie*. *See Riordan*, 977 F.2d at 53; *Adelson*, 774 F.3d at 809. The New York legislature has made the policy decision that mandatory fee-shifting applies to the subset of cases defined as SLAPP suits where the claim lacks a "substantial basis." And applying Section 70-a(1) in federal court would further the "twin aims" of *Erie* as articulated in *Hanna v. Plumer*: furthering equitable administration of laws and preventing forum shopping. 380 U.S. 460, 468 (1965). If federal courts refuse to apply this provision, defendants in state and federal court defending SLAPP suits will have very different outcomes. *See also Guaranty Trust Co. v. York*, 326 U.S. 99, 109 (1945) ("[T]he outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court."). Defendants in federal courts would have to pay the expenses of defending meritless SLAPP suits out of their own pockets. Meanwhile, defendants in state court would receive the fees intended for them by their state legislature. This inequitable outcome is exactly what *Erie* and its progeny sought to avoid. *See Hanna*, 380 U.S. at 468.

Prevention of forum shopping is also a concern implicated here. When a federal court refuses to apply a substantive right available in state court, forum shopping becomes a logical

---

[18] *See* Matthew L. Schafer & Tanvi Valsangikar, *The Application of the New York Anti-SLAPP Scheme in Federal Court*, 2 J. Free Speech L. 573, 601 (2023) ("No federal rule is sufficiently broad to control the issue addressed by § 70-a: whether a SLAPP defendant can recover damages for being forced to defend against a SLAPP. The oft-invoked Rules 12 and 56 do not speak to this issue because they do not establish a cause of action. Instead, they establish 'the circumstances under which a court must dismiss a plaintiff's claim before trial.'" (quoting *La Liberte*, 966 F.3d at 87)).

choice.  Plaintiffs may choose to bring meritless SLAPP suits in federal court to avoid having to

pay attorney's fees.  Finally, there are no countervailing federal considerations that would

outweigh the New York legislature's interest in protecting the robust free speech rights of New

Yorkers beyond that of the federal First Amendment protections.

### b.    Justice Stevens's Concurrence in *Shady Grove*

Even if a court were to find Section 70-a(1)'s "substantial basis" language to overlap with

Rule 12(b)(6)'s procedural standard, it does not necessarily follow that the substantive right to

attorney's fees is inapplicable in federal court.  Justice Stevens's concurrence in *Shady Grove* is

instructive here.  While Justice Scalia's plurality opinion broadly suggests that federal procedural

rules trump overlapping state rules, *see Shady Grove*, 559 U.S. at 409, Justice Stevens's

concurrence maintains that "there are some state procedural rules that federal courts must apply

in diversity cases because they function as part of the State's definition of substantive rights and

remedies."  *Id.* at 416-17 (Stevens, J., concurring in part and concurring in the judgment).[19]  As

several other judges in this Circuit have concluded, Justice Stevens's concurrence, as the

narrower holding in a plurality opinion, appears to govern.[20]  *See Marks v. United States*, 430

U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale

explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as

---

[19] All subsequent citations to *Shady Grove* refer to Justice Stevens's concurrence, unless otherwise noted.

[20] *See, e.g.*, *In re Chantix (Varenicline) Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, No. 22-MC-3050, 2024 WL 2784234, at *29 (S.D.N.Y. May 28, 2024); *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, plc*, No. 15-CV-6549, 2018 WL 7197233, at *53 (S.D.N.Y. Dec. 26, 2018); *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 443 n.9 (S.D.N.Y. 2016); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 415-16 (S.D.N.Y. 2011); *Delgado v. Ocwen Loan Servicing, LLC*, No. 13-CV-4427, 2017 WL 5201079, at *10 (E.D.N.Y. Nov. 9, 2017); *Greene v. Gerber Prods. Co.*, 262 F. Supp. 3d 38, 59-60 (E.D.N.Y. 2017).

that position taken by those Members who concurred in the judgments on the narrowest grounds." (quotation marks omitted)).

Though Justice Stevens joined the *Shady Grove* majority in holding that New York Civil Practice Law Section 901(b) was procedural and thus Federal Rule of Civil Procedure 23 trumped the state law, he envisioned a case where the line between substance and procedure was not so clear. *See id.* at 417-18. Justice Stevens reasoned that Congress, in passing the Rules Enabling Act, did not intend to "interfere with state substantive law." *Id.* at 418. After all, the Act mandates that the federal rules "shall not abridge, enlarge or modify any substantive right." *Id.* (quoting 28 U.S.C. § 2072(b)). To honor Congress's intention and respect the federalism balance struck by *Erie* many decades before, Justice Stevens wrote that "federal rules must be interpreted with some degree of 'sensitivity to important state interests and regulatory policies.'" *Id.* (quoting *Gasperini*, 518 U.S. at 427 n.7). Operationalizing this, Justice Stevens's second step after the *Shady Grove* majority's query of whether a state rule and federal rule conflict is to determine "whether the state law actually is part of a State's framework of substantive rights or remedies," looking to whether a state procedural law is "so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy." *Id.* at 420.

While Justice Stevens's *Shady Grove* concurrence was not relevant to the purely procedural special motion to strike in *La Liberte*, and thus the Second Circuit did not reach this second-level analysis, Justice Stevens's more nuanced test is relevant in this case, where a substantive right is clearly implicated. *Shady Grove*, 559 U.S. at 423.

Here, the Plaintiffs' argument that Rule 12(b)(6)'s pleading standard should nullify Section 70-a(1) would "effectively abridge[] . . . a state-created right" to attorney's fees. *See id.* at 418 (quoting 28 U.S.C. § 2072(b)). Plaintiffs are correct that the language in the statute—

"without a substantial basis in fact and law"—is not identical to Rule 12(b)(6)'s standard. But Plaintiffs' proposed outcome is exactly what Justice Stevens's concurrence is intended to avoid. Holding that a different procedural standard baked into a state statute for attorney's fees eliminates the right entirely flies in the face of the Rules Enabling Act and Congress's intent to ensure that substantive state rights and remedies are protected.[21] *Shady Grove*, 559 U.S. at 418.

The fact that Section 70-a(1) contains a differently worded standard for a defendant to obtain attorney's fees than a plaintiff must meet to overcome a motion to dismiss under Rule 12(b)(6) does not nullify the "substantial basis" language in Section 70-a(1). That is exactly why Justice Stevens in *Shady Grove* carved out the cases where procedure is "so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy." *Shady Grove*, 559 U.S. at 420. Section 70-a(1)'s operative language—"without a substantial basis in fact and law"—defines the contours of a case where a Defendant has the right to collect attorney's fees because the claim "has so little legal merit but was filed nonetheless to burden opponents with legal defense costs." *See Sweigert v. Goodman*, No. 118-CV-08653, 2021 WL 1578097, at *1 (S.D.N.Y. Apr. 22, 2021) (Aaron, Mag. J.); *Isaly v. Garde*, 213 N.Y.S.3d 852, 862 (N.Y. Sup. Ct. 2024) ("That the Legislature established a separate cause of action for anti-SLAPP remedies merely reflects the common will of New York that anti-SLAPP remedies be

---

[21] Here, though the grant of attorney's fees is a substantive right on its own, this statute also implicates larger issues of freedom of speech protections. The New York legislature passed the original anti-SLAPP statute "to safeguard 'the free exercise of speech, petition and association rights,' particularly as exercised by members of the public who are opposing a government action . . . against those who would try to interfere with a citizen's constitutional rights." *Yeshiva Chofetz Chaim Radin, Inc. v. Vill. of New Hempstead*, 98 F. Supp. 2d 347, 360 (S.D.N.Y. 2000) (quoting 1992 Sess. Laws News of N.Y.Ch. 767, § 1). And the statute was broadened in 2020 to expand those protections for defendants in SLAPP defamation suits even further. *See Sweigert v. Goodman*, No. 18-CV-8653, 2021 WL 1578097, at *1 (S.D.N.Y. Apr. 22, 2021) (Aaron, Mag. J.); *Reeves*, 218 N.Y.S.3d at 25-30.

available in federal court (where awarding anti-SLAPP remedies through procedural rules may

not carry through diversity procedure) as well [as] state court.").

Thus, whether or not a court were to determine that Section 70-a(1) has some procedure

bound up with the substantive right, its provision for attorney's fees applies in federal court.

### 2.    Availability of Attorney's Fees in the Original Action

Plaintiffs challenge Tarlov's demand for fees on another ground, arguing that under the

plain meaning of Section 70-a(1), Tarlov would have to bring a separate action or counterclaim

to recover any damages.  (Opp. at 32.)  The Court disagrees.  Section 70-a(1) states that "[a]

defendant . . . may maintain an action, claim, cross claim or counterclaim to recover damages" in

SLAPP suits.  N.Y. Civ. Rights Law § 70-a(1).  "[M]aintain[ing] an action" includes defendants'

continuing to litigate in an original action filed against them.[22]  To hold otherwise would put an

additional onus on defendants in SLAPP suits, undermining the New York legislature's intent in

broadening anti-SLAPP protections to protect defendants and prevent the chilling of speech.  *See*

*Isaly*, 213 N.Y.S.3d at 860-61 ("[T]he legislature's clear intent in crafting [the anti-SLAPP

statute] [was to be] a vehicle through which defendants could expeditiously halt SLAPP claims

and recover attorney's fees and costs without the burden of the same protracted litigation that

[the anti-SLAPP statute] was designed to combat.")  Tarlov's demand for attorney's fees in the

present action is thus sufficient to trigger Section 70-a(1), and she need not file a separate action

---

[22] *Breuer v. Jim's Concrete of Brevard, Inc.*, 538 U.S. 691, 695 (2003) ("'To maintain an action' may mean 'to continue' to litigate, as opposed to 'commence' an action. But 'maintain' in reference to a legal action is often read as 'bring' or 'file'; '[t]o maintain an action or suit may mean to commence or institute it; the term imports the existence of a cause of action.'" (citing *Black's Law Dictionary*) (cleaned up)); *see also Smallwood v. Gallardo*, 275 U.S. 56, 61 (1927) ("To maintain a suit is to uphold, continue on foot and keep from collapse a suit already begun."); *George Moore Ice Cream Co. v. Rose*, 289 U.S. 373, 377 (1933) (same).

or counterclaim.  *See Isaly*, 213 N.Y.S.3d at 861-62 (holding the same); *Aristocrat Plastic Surgery, P.C. v. Silva*, 206 A.D.3d 26, 32 (1st Dep't 2022) (permitting defendant in original action to collect attorney's fees under Section 70-a(1)); *Golan v. Daily News, L.P.*, 214 A.D.3d 558, 559 (1st Dep't 2023) (same).

### 3.    Application of Section 70-a(1)

Having established that Section 70-a(1) applies in federal court and applies to defendants moving to dismiss, the Court turns to the Complaint.  Tarlov is "a defendant in an action involving public petition and participation" under Section 76-a(1).  *See supra* Section III.A.2.a. And because Tarlov has succeeded in demonstrating that all of Plaintiffs' claims fail to state a cause of action, on multiple grounds, this action was "commenced or continued without a substantial basis in fact and law and could not be supported by substantial argument for the extension, modification or reversal of existing law."[23]  § 70-a(1).  Plaintiffs have failed to adequately allege three independent elements of defamation (defamatory statement, fault, and damages) and have failed to allege defamation by inference as an alternative element.  *See supra*

---

[23] Though this case was not adjudicated pursuant to CPLR Section 3211(g), that avenue is enumerated as merely one way the attorney's fees provision can be triggered.  *See* N.Y. Civ. Rights Law § 70-a(1) ("[C]osts and attorney's fees shall be awarded upon a demonstration, *including* an adjudication pursuant to [CPLR § 3211(g)] . . . ." (emphasis added)); *see also Goldman v. Reddington*, No. 18-CV-3662, 2021 WL 4099462, at *5 (E.D.N.Y. Sept. 9, 2021) ("[T]he provision creating a cause of action also makes clear that an anti-SLAPP litigant may obtain costs and attorney's fees *without* using [CPLR § 3211(g)]."); *Cheng v. Neumann*, 106 F.4th 19, 24 n.2 (1st Cir. 2024) ("We note that section 70-a does not condition an award of attorneys' fees solely upon prevailing under the procedural provisions of New York's anti-SLAPP statute, as opposed to under federal law."); *RSR Corp. v. Leg Q LLC*, No. 650342/2019, 2021 WL 4523615 (N.Y. Sup. Ct. Oct. 1, 2021) (holding that while a plaintiff demanding attorney's fees under Section 70-a(1) "*may* [do so] by obtaining a judicial disposition pursuant to CPLR 3211(g) or CPLR 3212(h)," the language of the statute "does not foreclose the possibility that a party may make the requisite demonstration by other means").

Section III.A.  Nor have they adequately alleged injurious falsehood, failing to plead two

independent elements (fault and damages).  *See supra* Section III.B.

Accordingly, Tarlov is entitled to attorney's fees under Section 70-a(1).[24]

### D.    Leave to Amend

Plaintiffs request leave to amend in the event that Tarlov's motion to dismiss is granted.

(Opp. at 33.)  However, Plaintiffs identify only one way they could amend their complaint to

overcome the deficiencies raised by the motion: by more specifically pleading special damages.

(Opp. at 25.)  Because Plaintiffs fail to adequately allege two other elements of defamation—

defamatory statement and fault—pleading more specific harm would be futile.  Further, no

additional facts could change the Court's holding that Tarlov's statements were not defamatory

as a matter of law.  *See Foman v. Davis*, 371 US. 178, 182 (1962) (directing courts to grant leave

---

[24] The Court respectfully disagrees with the decisions of other judges in this District to the extent they suggest that Section 70-a(1)'s fee-shifting provision—as distinguished from the procedural elements of Section 70-a(1)—does not apply in federal court.  *See, e.g., National Acad. Tel. Arts & Sciences, Inc. v. Multimedia Sys. Design, Inc.*, 551 F. Supp. 3d 408, 431-32 (S.D.N.Y. 2021); *Carroll v. Trump*, 590 F. Supp. 3d 575, 583-85 (S.D.N.Y. 2022); *Kesner v. Buhl*, 590 F. Supp. 3d 680, 700-01 (S.D.N.Y. 2022).  In stating broadly that "[t]he 'substantial basis' standard of the New York anti-SLAPP law . . . conflict[s] with the standards of Rules 12 and 56," *id.* at 700, these decisions fail to distinguish between the "substantial basis" standard as a *procedural mechanism for dismissal*—which conflicts with Rule 12—and the "substantial basis" standard as a *substantive standard for entitlement to attorney's fees*—which does not conflict with any federal Rule.  Thus, in this Court's view, these decisions rest on an overly broad reading of *La Liberte* and fail to adequately take account of the Second Circuit's *Adelson* decision and New York appellate court decisions specifically applying Section 70-a(1)'s fee-shifting provision.  In another case, Judge Liman took a different approach, holding that Section 70-a(1)'s fee-shifting provision conflicts with Rule 11 because it "provides for sanctions in a broader range of cases than Rule 11 and is intended to deter more lawsuits."  *Brady v. NYP Holdings Inc.*, No. 21-CV-3482, 2022 WL 992631 (S.D.N.Y. March 31, 2022).  Again, the Court respectfully disagrees.  The New York courts have treated this provision not as a "sanction," but rather as a "mandatory award of attorneys' fees to the prevailing defendant" in a SLAPP suit.  *Reeves*, 218 N.Y.S.3d at 26.  Treating state-law fee-shifting provisions as "sanctions" would be contrary to the settled law that such provisions are substantive under *Erie* and "should be followed" in diversity cases in federal court.  *Alyeska Pipeline*, 421 U.S. at 259 n.31.

to amend in the absence of factors including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."); *see also McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200-01 (2d Cir. 2007).  Plaintiffs' request for leave to amend is thus denied on the ground of futility.

## IV.    Conclusion

For the foregoing reasons, Tarlov's motion dismiss is GRANTED and her demand for attorney's fees is GRANTED.  Plaintiffs' request for leave to amend is DENIED.

Tarlov shall submit any request for attorney's fees and costs with appropriate documentation on or before December 20, 2024.  Her publicly filed submission may be redacted for privileged matters, with an unredacted version submitted to the Court by email.  Plaintiffs may file any response on or before January 15, 2025.

The Clerk of Court is directed to close the motion at Docket Number 17.

SO ORDERED.

Dated:  November 26, 2024
          New York, New York

_____
          J. PAUL OETKEN
          United States District Judge