UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **ANTHONY BOBULINSKI** and **STEFAN PASSANTINO**,<br><br>      *Plaintiffs*,<br><br>v.<br><br>JESSICA TARLOV,<br><br>      *Defendant*. | Civil Action No.<br>1:24-cv-02349 (JPO)<br><br>**DECLARATION OF<br>RONALD D. COLEMAN** |

Ronald D. Coleman, under penalty of perjury pursuant to 28 U.S.C § 1746, declares and says as follows:

1. I am a member of the bar of this Court and of counsel to the Dhillon Law Group, from whose partnership I retired approximately one year ago. I submit this Declaration in support of Plaintiffs' opposition to the quantum of attorneys' fees sought by counsel for Defendant, premised as that request is by the Declaration of Patrick F. Philbin and its exhibit A.

2. I am a graduate of Princeton University and Northwestern University School of Law and was admitted to practice law in the State of New York in 1989. I have been admitted to the bars of the Courts of Appeal of every United States Circuit as well as the United States Supreme Court, and to the bar of the State of New Jersey as well as numerous other federal jurisdictions. I have practiced commercial, intellectual property and reputation-related litigation, including defamation and anti-SLAPP practice, in New York and in other state and district courts throughout the United States for decades, and as a partner in firms of various sizes. In the most recent such engagement, the United States Court of Appeals for the Eleventh Circuit reversed the dismissal of

a complaint drafted by me and on which I was among counsel of record in the matter styled *Project Veritas v. Cable News Network, Inc.* (1:21-cv-01722-SCJ) in the Northern District of Georgia.

3.      I am also very familiar with the motion practice pursuant to Fed. R. Civ. P. 12(b)(6), both in defamation cases and otherwise. Besides having the volume of experience with such practice that would be expected of a civil litigator who has practiced as long as I have, I was the primary author of the chapter on responses to the complaint in the first edition of the six-volume *Business and Commercial Litigation in the Federal Courts* published by West in association with the American Bar Association Section on Litigation. That work is now in its fifth edition.

4.      I also have experience with fee applications in a wide variety of contexts, as well as with the management of substantial teams of attorneys on projects such as the motion relating to the dismissal of the claims in this action and for which Defendant seeks reimbursement.

5.      As a threshold matter, I submit that the professional bona fides of the Torridon attorneys who are reported to have worked on Defendants' anti-SLAPP motion are beyond cavil. Their experience and credentials are stellar. Their respective hourly rates are, based on my familiarity with the field, commensurate with those charged by elite law firms that serve public companies and their like in New York City and Washington, DC.

6.      Having said this, the total amount of $333,674.66 for fees and costs, for a motion to dismiss a defamation case, even with an accompanying request for anti-SLAPP sanctions and notwithstanding the fact that certain aspects of the law are unsettled, appears to be excessive – perhaps double what I might have expected, based on my experience both as a partner managing such projects and having reviewed applications for fees submitted by other firms in litigation.

7.      In ¶ 13 of the Philbin Declaration, Mr. Philbin states that the case presented "multiple legal issues, all of which had to be addressed to ensure the case would be dismissed."

He details these in the next paragraph, as follows: (1) failure to allege a defamatory statement; (2) failure to allege either per se defamation or special damages; (3) the single-instance rule; (4) failure to allege actual malice; (5) failure to state a claim for defamation by implication; (6) failure to state a claim for injurious falsehood.

8. As the Court is no doubt aware, however, these are grounds that have been advanced by defendants seeking to dismiss defamation claims in New York for generations. Their respective elements are also to a considerable extent redundant or overlapping, and there is deep stock of decisional law supporting these defenses in both the Federal and New York case reports. Preparation of these arguments in support aspect of the motion to dismiss, regardless of the extent of the factual allegations to which Defendant had to apply them, should not have required extensive research and drafting.

9. Mr. Philbin next asserts, in ¶ 15, that a substantial investment of time was required for a deep dive into the fee shifting of New York's anti-SLAPP law, requiring a "full review of the decisions in this field" as well as of the legislative history of N. Y. Civ. Rts. L. § 70-a. No doubt this is, as Mr. Philbin observes, an area of law that is in flux. But in the few years since that statute was enacted, numerous decisions (as Plaintiffs no doubt have brought to the Court's attention in their memoranda of law), have already illuminated these issues. There was no need to reinvent the wheel of statutory history analysis for this motion; moreover, the state and federal cases on each side of the issues are both relatively few in number and, helpfully, tend to be cumulative – that is, these decisions themselves recognize where the disputes about the application of this law lie and what previous courts have said about them.

10. Defendant also avers that "questions regarding the public figure status of both Plaintiffs" required research. I submit, based on my experience as well as my familiarity with the

facts here, that research to establish facts that would illuminate how to apply the legal standard cannot have taken more than a handful of hours, and that such work would not have required the attention of a senior litigator.

11.     I will now turn to some of the specific charges set out in Exhibit A, and start with the observation that the most junior lawyer on the litigation team, based on Mr. Philbin's declaration, is Mr. Harrington, who graduated from law school in 2017. Because of his time as a judicial clerk with two distinguished appellate courts, Mr. Harrington must be reckoned as at least an eighth-year associate. The next-most-senior associate on the team was Mr. West, who has been out of law school for over ten years. Another partner, Mr. Katz, billed the fewest hours.

12.     There can be no question, of course, that more experienced lawyers frequently do work such as basic research and writing at a level that is far more efficient than those with less experience, and that this is productivity advantage is reflected in their respective hourly rates.

13.     These efficiencies, however, do not appear to be reflected in the specific time charges by Mr. Harrington and Mr. West, who, together, billed nearly eight hours on "New York defamation law" and "actual malice" on April 16th alone. This is a substantial amount of time for relatively experienced lawyers to research such well-developed broad topics. These time charges suggest that these associates may have actually been learning the basics of New York defamation law in the course of this assignment. Indeed, Mr. Harrington's professional biography, posted on the website of this law firm, makes no reference to any experience in this area of law (see Exhibit A) but, rather, a focus on an impressive range of public-sector topics.

14.     The same cannot be said of Mr. West, whose online biography lists defamation as one of his areas of experience. (See Exhibit B.) Like Mr. Harrington, however, Mr. West is not admitted to practice in the State of New York, and while involvement in multistate practice at such

a young age is certainly impressive, it does appear that Defendant's District of Columbia–based firm used this case as an opportunity to expose both of these attorneys, perhaps for the first time, to what are really basic principles of New York defamation law.

15. Combined, these two attorneys spent an addition 25 hours on tasks described, at least in part, as "research" in April alone – solely with respect to New York's basic causes of action sounding in defamation. This is even without second-guessing the innumerable "drafting," "revising" and "reviewing" type entries which, together with internal meetings, amounted to over 72 hours of billed time by the two associates. Neither of them, nor the junior partner, Mr. Katz is described by Mr. Philbin as having experience in defamation litigation.

16. At the other end of the scale, Mr. Philbin himself, who was the senior lawyer on the team, in April billed more hours than either of his associates, and at a rate concomitant with his experience and seniority of $1,338.75. Because most of his April entries were redacted, his fees are not included in the requested award. But the amount of time spent by him in tasks described as "reviewing" and "analyzing cases" suggest that Mr. Philbin may very well have spent in inordinate amount of time re-doing the work performed and billed by the associates.

17. Indeed, the very first entry in the next invoice, reflecting time billed in May, is an unredacted 7.5 hour charge by Mr. Philbin "revising" the draft motion and reviewing and analyzing cases on fee shifting. Mr. Philbin's investment in demonstrating how to prepare such a motion to a high level of professionalism, to the extent of analyzing cases himself, certainly provided a highly beneficial training experience to Mr. West and Mr. Harrington. But Plaintiffs should not have to pay for that experience.

18. In fact, what comes across in review of these time charges is a striking number of entries involving reviewing cases, reviewing and revising drafts, and then reviewing and revising

5

them – again and again and again. It must be acknowledged that many of these entries contain redacted matter, but the fact of so much reviewing and retracting cannot be ignored in trying to evaluate how this motion could have resulted in expenditures of over a third of a million dollars. This cycle of editing, revising, circulating, revising, proofreading is of course not unknown at the highest level of legal practice, but the extent to which it is described in Defendant's exhibit A in April and May of 2024 suggests that the while Torridon team's diligence was remarkable, its efficiency – a bona fide criterion for evaluating the reasonableness of a fee application – was not.

19. And, again, it is impossible not to be struck by the fact that Mr. Philbin billed, by far, the most hours in preparing Defendant's motion in May of 2024 – 57 hours, compared to 49 for Mr. Harrington, the next-highest figure. It bears repeating that much of Mr. Philbin's time is being, so to speak, "written off" for purposes of this motion. And because Torridon describes itself as a "boutique" law firm, my understanding is that in such firms clients expect more hands-on involvement by partners in the litigation workflow than would typically be the case in a "Biglaw" environment based on so-called "leverage." It does seem fair to say, however, that the measure of Mr. Philbin's personal involvement in the preparation of these submissions raises questions of reasonableness based on what the invoices suggest may be underutilization of junior partners and mid-level or junior associates.

20. The same can be said for the penultimate invoice in Defendant's exhibit A, which contains the time charges for Defendant's reply brief. It is hard to see how, in the wake of the considerable extent of research and analysis invested in preparing Defendant's moving brief, the reply brief could have raised so many new issues and research topics – and the multiplicity of "research" entries in this invoice is plain – such that preparing the reply called for nearly 73 hours of time amounting to an original bill of $68,805.38. While a creative and dogged adversary can

often provide a movant with unexpected surprises, novel approaches or challenging arguments in an opposition submission – which doubtless occurred here – the extent of additional research required for Defendant's reply brief shown on in the July 2024 time charges raises questions about the just how thorough the original research could have been, especially in light of what it cost.

21. I also am constrained to note, again, that Mr. Philbin billed the most time in July – 31 hours, half again as much as the next-highest biller, again suggesting that the allocation of professional resources was not properly balanced on this project.

22. Finally, the last invoice in exhibit A shows a total of $43,694.27 in connection with preparation for and conduct of oral argument on the Defendant's ultimately successful motion. This work was done almost entirely by Mr. Philbin, which is entirely reasonable considering that he was arguing the motion. Any lawyer should experience some distaste and reluctance to second-guess how other lawyers – especially such distinguished lawyers as those who represented Defendant – do their work, and if the undersigned has succeeded at all in hiding his in the observations set forth above, it would be quite difficult to do so in connection with this last invoice.

23. Ultimately, Defendant secured both a dismissal of the action and a grant of statutory sanctions in the face of considerable contrary case law. The connection between this outcome and the meticulous preparation of her legal team makes it nearly impossible to gainsay how much preparation for oral argument is "too much."

24. Having said this, it does not appear that there is any justification for taxing Plaintiff with the last two entries on this last invoice, which describe the post-argument debriefing with Defendant by Mr. Philbin and Mr. Katz's "review" of the oral argument transcript and emailing of it to the Torridon team. These activities did not affect the work done to achieve the litigation result

toand seem to be related to client relations and internal management, and their cost should be borne by either Defendant or Torridon itself.

    I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 27, 2025  
Washington, D.C.

                                                                              RONALD D. COLEMAN